# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| GREGORY THOMAS, | * | |
| Plaintiff | * | |
| v | * | Civil Action No. GJH-17-1715 |
| WARDEN DENISE GELSINGER, *et al.* | * | |
| Defendants | * | |
| | *** | |

## MEMORANDUM OPINION

Plaintiff Gregory Thomas, a state inmate confined at the Western Correctional Institution (WCI), filed this civil rights complaint against Defendants Warden Denise Gelsinger, Warden Richard Graham, Correctional Officer II Daniel Faulkner, Correctional Officer II Trey Brenneman, and Correctional Officer II Sharon Dayton.[1] Pending before the Court is Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment. ECF No. 8. Plaintiff opposes the motion. ECF No. 14. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, Defendants' motion, construed as a Motion for Summary Judgment, is granted.

## I. BACKGROUND[2]

On April 19, 2015, at approximately 9:10 a.m., Officer Sharon Dayton, who was assigned to housing unit 1 A wing, went to the upper A wing recreation hall after hearing an inmate yelling loudly. ECF No. 8-2 at 18 (Notice of Inmate Rule Violation).[3] There she observed Thomas acting in a loud and disruptive manner, waving his arms, appearing to be under the influence of an unknown controlled dangerous substance. *Id.*; ECF No. 8-2 at 2 (tier log). He

---

[1] The Clerk shall amend the docket to reflect the full and correct spelling of Defendants' names.
[2] The facts relied on herein are either undisputed or viewed in the light most favorable to the Plaintiff.
[3] Officer Dayton affirmed "under the penalties of perjury and upon personal knowledge that the facts set forth" in the Notice of Inmate Rule Violation were true.

yelled, "I'm on the honor tier, you can't do shit to me." ECF No. 8-2 at 18. Dayton noted that Thomas failed to follow direct orders and she called for assistance. ECF No. 8-2 at 2.

Officers Faulkner and Brenneman responded to the call for assistance and saw Thomas standing in front of the recreation hall bathroom yelling and acting erratically. ECF No. 8-2 at 10 (Faulkner Use of Force Report); ECF No. 8-2 at 52 (Brenneman Use of Force Report).[4] Thomas was observed clenching his fists and "display[ing] an aggressive defensive stance." ECF No. 8-2 at 10, 18, 52. He spoke incoherently and "put his hands in the air and stated, 'Don't shoot.'" ECF No. 8-4 at 11 (Faulkner interview with Intelligence and Investigative Division (IID)); ECF No. 8-4 at 11 (Brenneman interview with IID).[5] Thomas appeared to Faulkner and Brenneman to be under the influence of an unknown controlled dangerous substance. ECF No. 8-2 at 10, 52. Faulkner directed Thomas several times to turn around in order to be handcuffed, but Thomas refused to comply. ECF No. 8-2 at 10, 18, 52; ECF No. 8-4 at 11, 12. Due to concerns of a possible fight, Brenneman called for additional assistance to the wing. ECF No. 8-2 at 10, 18, 52. As other officers arrived on the wing, Thomas dropped to the floor and continued to yell in such a way that officers believed he was attempting to incite other inmates. ECF No. 8-2 at 5, 7, 13. Because housing unit 1, A wing, is an honor tier all of the cell doors remained open. ECF No. 8-2 at 10, 18, 52. Faulkner attempted to place handcuffs on Thomas but he resisted. ECF No. 8-2 at 10, 18, 52; ECF No. 8-4 at 11. Ultimately, with the assistance of Brenneman, Faulkner applied the handcuffs. ECF No. 8-2 at 10, 18, 52. As Faulkner and Brenneman escorted Thomas to the medical department, Thomas continued to yell and attempt to incite other inmates. ECF No. 8-2

---

[4] Defendants provided declarations from Officers Faulkner, ECF No. 8-6, and Brenneman, ECF No. 8-7, wherein they each aver that their Use of Force Reports regarding the events of April 19, 2015 are true and accurate and that the statements made by them to Intelligence and Investigative Division (IID) are also true and correct. *Id*.

[5] In his opposition response, Thomas confirms that when he was approached by Brenneman and Faulkner he stated, "hands up don't shoot" when they directed he be handcuffed. ECF No. 14 at 1. He also admits that when asked again to submit to the handcuffing he asked, "why?" and that he told the officers that since he was an inmate on the honor tier they could not just "do whatever [they] want[ed]." *Id*. at 2.

at 10, 18, 52; ECF No. 8-4 at 11. He also acted aggressively toward Faulkner and Brenneman, spitting, jumping, and attempting to pull away from them. ECF No. 8-2 at 10, 18, 52; ECF No. 8-4 at 11. Thomas denies spitting, jumping, or pulling away from the officers. In his opposition response, Thomas indicates that due to a pre-existing knee injury, during the escort his knee began to hurt and he "attempted to shift his weight to one side to minimize the pressure and pain on his knee from the unusual position the Officers were escorting him in." ECF No. 14 at 2. Then without warning his "leg was clipped from beneath him" and he lost his footing and was taken to the ground. *Id*. He alleges, for the first time in his opposition response, that he was kicked in the face once on the ground. *Id*. However, Thomas does not support these assertions with any record evidence.

Faulkner and Brenneman took Thomas to the ground in order to gain control over him. ECF No. 8-2 at 10, 18, 52; ECF No. 8-4 at 11, 12. Video of the incident shows Faulkner and Brenneman escorting Thomas across the compound and taking him to the ground. ECF No. 14-4. Although Thomas claims that he was lifted up of his feet and slammed onto the concrete ground, the video shows that Thomas was neither lifted off the ground nor slammed into the ground. *Id.* It does show, however, that while Thomas was handcuffed, Brenneman and Thomas pushed him facedown to the concrete ground in an apparent effort to control him. Another officer, Lieutenant Smith, observed Thomas attempting to pull away from the officers and yelling at the officers and other inmates. ECF No. 8-4 at 12 (Smith interview with IID). Smith also reported that Thomas was out of control, yelling, and did not appear to know what was going on. ECF No. 8-4 at 12.

Paula Conners, RN evaluated Thomas. She noted that when he was brought to medical, "[h]e was yelling and screaming, 'it is God's day.'" ECF No. 8-2 at 23. Initially he would not stop yelling long enough to be questioned. Eventually he was evaluated and a 5 centimeter

3

laceration with partial detachment was noted above his right ear. ECF No. 8-2 at 23. A 2-3 centimeter laceration was noted above his right eye. ECF No. 8-2 at 23. Plaintiff declined to have any suturing or other treatment or evaluation. ECF No. 8-2 at 23. The wounds were cleaned and dressed and Thomas was taken to special housing. ECF No. 8-2 at 23. There, while undressing, another wound was discovered and medical was called to come reassess Thomas. ECF No. 8-2 at 23. An abrasion, 9 centimeters in diameter, with swelling and dried blood was observed on Thomas's right shoulder. ECF No. 8-2 at 23. Plaintiff appeared to be calming down and was advised by Conners that he should consent to having a physician assess him later. He indicated his agreement but continued to refuse suturing. ECF No. 8-2 at 23. Conners returned to the special housing unit at approximately 12:20 p.m. that afternoon and asked Thomas if he would consent to the provider coming to look at him. ECF No. 8-2 at 23. He agreed he would. Conners noted that Thomas "appear[ed] hypervigilant in his physical and emotional reaction, pacing and quick responses." ECF No. 8-2 at 23. Conners contacted the physician who indicated he and the physician's assistant would evaluate Thomas when they were available. *Id.* Conners also noted that custody staff advised that in order to provide safety extra staff would need to be present for the assessment. ECF No. 8-2 at 23.

Later that day, at approximately 3:47 p.m., Krista Swan, RNP treated Thomas. ECF No. 8-2 at 21. She noted that he suffered a small head laceration and right ear laceration. She described him as alert and oriented. Thomas refused to have the right ear laceration, which was described as a "partial detachment," sutured. ECF No. 8-2 at 21. He told Swan that, "I am a child of God and I will heal on my own, right before your eyes." ECF No. 8-2 at 21. Thomas did submit a urine sample, which was negative for CDS. ECF No. 8-2 at 92-93.

4

The following day, Thomas refused wound care stating, "I am God in the flesh, my ear will grow back [and] I may not be alive tomorrow." ECF No. 8-2 at 57. That day a member of the psychology staff, Jonathan Hess, provided Thomas with individual therapy. ECF No. 8-2 at 29. Mr. Hess reported that Thomas was loud and boisterous during the therapy session. ECF No. 8-2 at 29. Thomas told Mr. Hess "that he becomes very passionate about certain things and becomes loud." ECF No. 8-2 at 29.

On April 21, 2015, Thomas refused to take medications or allow his dressings to be changed. ECF No. 8-2 at 59. He yelled at the medical provider and laughed while stating, "I am a God." ECF No. 8-2 at 59. He was also seen that day by psychology staff. ECF No. 8-2 at 31. He was described as "alert but not fully oriented. He is argumentative and has difficulty understanding why he is in SOH." ECF No. 8-2 at 31. When challenged that his behavior was out of character, he responded that he was fine and that he "is just very passionate at times about certain things." ECF No. 8-2 at 31.

On April 22, 2015, Thomas again refused medication. ECF No. 8-2 at 60. He was observed singing and yelling which could be heard outside of the special housing area before entering the door. ECF No. 8-2 at 60. Later that day he consented to a dressing change, but again refused medication. ECF No. 8-2 at 61.

Thomas was seen again by psychology staff on April 23, 2015. He continued to be loud and boisterous and his speech was described as cyclical. ECF No. 8-2 at 33. He calmed down later in the day and asked to speak to members of the psychology staff to whom he expressed his belief that the incident was all a misunderstanding, that he was never under the influence of drugs, and was simply speaking passionately to other inmates. ECF No. 8-2 at 33–34. His demeanor was described as much improved and calmer. ECF No. 8-2 at 35. The following day,

5

Thomas was alert and oriented, his speech was normal in rate and tone and he appeared calmer. ECF No. 8-2 at 38. He was determined not to be a risk for self-destructive behavior and released from observation status. ECF No. 8-2 at 38.

Thomas was evaluated by medical staff on April 29, 2015. He complained of right and left shoulder pain as well as neck pain. He was provided analgesic medication and x-rays of his shoulder and neck were ordered. ECF No. 8-2 at 64. He continued to receive wound care. ECF No. 8-2 at 66, 68.

As a result of the incident, Thomas was charged with inmate rule violations: Rule 100 (engage in a disruptive act); 312 (interfere with or resist the performance of staff duties to include a search of a person, time, area or location); and 400 (disobey an order). ECF No. 8-2 at 72. After a contested hearing, Thomas was found guilty of all three infractions. ECF No. 8-2 at 78. He was sanctioned with 250 days of segregation, the revocation of 200 good conduct credits, and indefinite loss of visitation. ECF No. 8-2 at 79–80.

During the subsequent IID investigation, Thomas was interviewed. ECF No. 8-4 at 10. At that time, he reported that on the date of the incident he was talking to other inmates about the shooting of Michael Brown and the shooting in Charleston, S.C. ECF No. 8-4 at 10. Officers arrived and patted him down. ECF No. 8-4 at 10. He asked the officers what was wrong and did not know why the officers were on the tier. ECF No. 8-4 at 10. As they escorted him off the tier they "picked [Thomas] up and put [him] to the ground." ECF No. 8-4 at 10. Thomas reported that he might have blacked out a couple of times. ECF No. 8-4 at 10. He denied ingesting or smoking anything that day. ECF No. 8-4 at 10. He denied attempting to spit, jump, or pull away from the officers during the escort. ECF No. 8-4 at 10.

6

On April 30, 2015, Thomas filed an Administrative Remedy Procedure (ARP) with Acting Warden Denise Gelsinger regarding the incident. ECF No. 1 at 2. Gelsinger dismissed the ARP and Thomas appealed to the Commissioner of Correction who denied the appeal. *Id*. at 2. Thomas filed an appeal with the Inmate Grievance Office (IGO) which dismissed the appeal as lacking merit. *Id*.

On June 22, 2017, Thomas filed an unverified complaint naming Warden Denise Gelsinger, Warden Richard Graham, and correctional officers Faulkner, Brennemen, and Dayton as defendants. He alleged that on April 19, 2015 while he was engaged in a political discussion in the dayroom, officers approached him and ordered him to turn around and be handcuffed. ECF No. 1 at 1. He claims that while being escorted out of the housing unit handcuffed behind his back, "both officers lifted Plaintiff up off of his feet and slammed him onto the concrete ground smashing his head into the ground." *Id*. at. 1–2. He reports that he has suffered ongoing medical issues as a result of the incident. *Id.* at 3.

**II.    STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is appropriate where a complaint does not contain "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

If the Court considers matter outside the pleadings, the Court must treat a motion to dismiss as one for summary judgment. *Jakubiak v. Perry,* 101 F.3d 23, 24 & n. 1 (4th Cir. 1996). When the Court treats a motion to dismiss as a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* It is obvious that when the moving party styles its motion as a "Motion to Dismiss or, in the

Alternative, Motion for Summary Judgment," as is the case here, and the nonmoving party attaches exhibits to its opposition, the nonmoving party is aware that materials outside the pleadings are before the court, and the Court can treat the motion as one for summary judgment. *See Laughlin v. Metropolitan Wash. Airports Auth.,* 149 F.2d 253, 260–61 (4th Cir.1998). Further, a court is not prohibited from granting a motion for summary judgment before the commencement of discovery. *See* Fed. R. Civ. P. 56(a) (stating that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" without distinguishing pre- or post-discovery). However, summary judgment should not be granted if the nonmoving party has not had the opportunity to discover information that is essential to his opposition to the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5 (1987). If the nonmoving party feels that the motion is premature, that party can invoke Federal Rule of Civil Procedure 56(d). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326 (1986). Under Rule 56(d), a court may deny a motion for summary judgment if the nonmovant shows through an affidavit that, for specified reasons, he cannot properly present facts, currently unavailable to him, that are essential to justify an opposition. Here, the nonmovant has not filed an affidavit under 56(d).

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322-23. Therefore, on

those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

## III. DISCUSSION

### A. Personal Participation

Section 1983 provides for liability of "[e]very person who, under color of [state law], *subjects, or causes to be subjected*, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added)). "Although § 1983 must be read against the background of tort liability that makes a man responsible for the natural consequences of his actions, liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiffs' rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (citation, alteration, and internal quotation marks omitted). Here, there has been no evidence presented that Defendants Gelsinger or Graham were involved in the incident.

9

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). That sort of evidence has not been presented in this case regarding Wardens Gelsinger or Graham.

More than a simple allegation that a Defendant held a position that ostensibly imposed a duty upon them to insure their subordinates did not engage in misconduct is required. Neither Gelsinger nor Graham participated in the use of force against Thomas and there is no evidence that Gelsinger or Graham authorized an unconstitutional act. The uncontroverted evidence is that Gelsinger and Graham investigated Thomas's complaints regarding the incident relative to his ARPs and appeal of his adjustment conviction. Thomas's claims against Gelsinger and Graham consist only of bald assertions without facts or evidence to support the conclusory allegations.

Where, as here, there is absolutely no allegation or any evidence with respect to the Defendants Gelsinger and Graham they are entitled to judgment as a matter of law. Decisions by correctional staff considering inmate complaints without more does not establish personal participation in the alleged constitutional violation. *See Atkins v. Maryland Div. of Correction*, 2015 WL 5124103 at *6 (D. Md. 2015) (act of denying grievances); *Scott v. Padula*, 2010 WL 2640308, *3 (D. S.C. 2010) (failure to investigate or process a grievance); *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) ("[A] denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983"). As such, Gelsinger and Graham are entitled to Summary Judgment as a matter of law.

### B. Use of Force

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). A court must look at "the need for application of force"; "the relationship between that need and the amount of force used"; "the extent of the injury inflicted"; "the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials"; and "any efforts made to temper the severity of the response." *Whitley v. Albers*, 475 U.S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). The extent of the injury incurred is one factor indicating whether the force used was necessary in a particular situation, but if force was applied maliciously and sadistically, liability is not avoided simply because the prisoner had the "good fortune to escape without serious injury." *Id.* at 36–38.

Thomas has failed to adequately refute Defendants' motion. He has not provided evidentiary support for his claim that the force used against him was objectively unreasonable. Taking the facts in the light most favorable to Thomas, his excessive force claim fails as the disputes of fact he raises are not material to the determination of this claim. Thomas does not dispute that instead of complying with Faulkner's orders, he questioned the officer's authority to cuff him. Although Thomas denies spitting, jumping, or pulling away from the officers, his recounting of the incident indicates that while under escort he shifted his weight to relieve pressure on his knee, which reasonably could have been construed by Defendants, particularly in light of Thomas's erratic behavior, as his pulling away from the escort. While the force used by officers—pushing Thomas facedown to ground while he was already handcuffed—may not have been entirely necessary, it was not applied "maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992).

Given the events described by Defendants and supported by record evidence, including a video, the force used against Thomas was not unreasonable. Thomas was acting in a bizarre and erratic manner, questioning staff as to their authority to handcuff him, and jerking away from the escort. The injury resulting from the encounter is consistent with Defendants' version of events, that Thomas was taken to the floor in order to gain his compliance, and demonstrates that the response was tempered in that only the amount of force used to gain control over Thomas was applied. The medical evaluation he received after the use of force also establishes that Thomas's behavior was bizarre and irrational, which continued for several days while Thomas was held in special housing. Under these circumstances, some force was necessary to secure Thomas's movement, control his erratic behavior, and prevent his further inciting of other inmates. For these reasons, the Court grants summary judgment in favor of Defendants.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment IS GRANTED. Judgment will be entered in favor of Defendants. A separate Order follows.[6]

September   27, 2018                                     /s/
                                          GEORGE J. HAZEL
                                          UNITED STATES DISTRICT JUDGE

---

[6] In light of the foregoing the Court need not address Defendants' immunity defenses.